The court now calls the case number 115756, agenda number 2, People v. State of Illinois v. Ronald Stoecker. Are you ready to proceed? Yes, Your Honor. Good morning. May it please the Court, Counsel, I am Assistant Attorney General Erin O'Connell on behalf of the people. We're presented with a case where we can be absolutely certain that the defendant is a person who killed 15-year-old Jean Humboldt. We would be certain of the defendant's guilt of this crime even if no forensic testing had been conducted at all. We know that the defendant was in the area immediately before the victim was abducted. He was seen driving a red car, carrying a knife on his belt. He then drove the victim an hour away from where she was abducted to an isolated tract of land where he himself had lived and knew at that time to be unoccupied. Once at this isolated location, he then raped the victim and slit her throat. She nevertheless survived her attack long enough to make it to the hospital to tell detectives who did this to her. She gave them a physical description that matched the defendant. She gave a description of his red car. Coincidentally, the same morning that she was undergoing treatment, the defendant had gone last minute to the airport in Chicago to buy a ticket in cash to Costa Rica. He knew Costa Rica to be a location where he believed he could not be extradited. At the same time he is on this plane fleeing from the scene of the crime, his family members are in the front yard burning the inside of the red car that he was driving that night. They're ripping out the seats. They're ripping out the fabric, destroying any forensic evidence that might be present in the car. We don't, however, have to go only on the circumstantial evidence in this case. We also know, pursuant to three pretrial DNA tests, that defendant is the person who raped and killed Jean Humboldt. One of these tests could not be more conclusive. Rhonda Carter, when she examined the DNA profiles and compared them, testified that defendant matched at 9 loci and that the same DNA profile is expected to occur once per 1.1 trillion Caucasians. I'm sure the Court is aware there are approximately 7 billion people on the planet. This would be over 100 times the population of the Earth. And this would be expected to occur once within that group of people. Defendant is seeking to avail himself of an important statute, a statute that enables individuals who have been convicted on less certain, less compelling evidence to avail themselves of changes in technology that can potentially help them prove a claim of actual innocence. The statute, however, clearly was not intended to apply here to this defendant under these circumstances. And there are two important limitations that the General Assembly set forth in the statute that defendant here has failed to meet. The first of these is under C1, which requires that there be a scientific potential for evidence materially relevant to a claim of actual innocence. And the second provision, which is set forth separately, was enacted independently, is subsection A2, which requires that we look at the test that he is requesting and see whether there is a possibility, a realistic possibility, that it will produce results more probative than a testing that was done before trial. Previously, this Court construed the language in C1. In People v. Savory, this Court held that a defendant may satisfy C1 if he shows that there is a possibility for the test that he requests to produce evidence that would significantly advance a claim of actual innocence. This Court reasoned that this determination must take into account the evidence at trial. We know that here any further testing would be the same result as what we've gotten three times before. The test that he's requested, were it conducted, we already know from the record that the result of that test is also going to match defendant's profile to the crime scene sample. But if counsel, Ms. O'Connell, if there is a chance that the problems occurred during the differential extraction of the DNA sample, should we give the defendant the benefit of the doubt and grant his request for new DNA testing? What's the prejudice? Well, I would respond in two parts. The first is that there is no evidence to support his speculation that there was an error in the differential extraction. What occurred was precisely what was supposed to occur, which is that in dividing the sperm cells from the remaining cells, the forensic scientists were able to isolate the sperm cells and create what they called a male fraction, which contained one individual's DNA. It was the male DNA from the sample, and that was matched to the defendant. Was there a possibility that it could have been contaminated with other types of cells? Wasn't there something about that? I mean, the defendant did raise this for the first time before this Court. There is no evidence that would support this either, that there was some form of contamination. But the contamination that he alleges would mean that the crime scene sample was contaminated with his own DNA. So the result... Or female cells? Well, we know that it was contaminated with the female cells because there's only one profile in the male fraction. And so we know, and as we've explained, that part of the differential extraction that produces the female fraction typically produces a mixture in which, although the bulk of the DNA is from the female contributor, there is also expected to be a small amount of the male contributor still present in that sample. But we know here that there is no reason to conclude that there was any impropriety in conducting the test. And one thing I would note is that where a differential extraction fails, the usual result is that there are no results from the testing. They're inconclusive. The scientists are unable to discern from the mixture that they get what the single male profile was. Whereas here, I mean, we had three separate DNA tests run, and they all produced results. They all identified the male DNA in the male fraction as being the defendants. Now, the question as to... Let me ask you a question. Both you and the appellee rely extensively on this Butler thesis. Was any of that ever presented to the trial court? I don't believe so. Is this the first time that you're relying on? Your Honor... And if so, then let me ask you this specific question. I noticed there was one place in your reply brief where you disputed a statement as to the science that the appellee makes. And my question is, if this is all being presented to this Court for the first time, are you asking us to do fact-finding? Your Honor, I believe the correct result in this case is that it was defendant's burden in the trial court to allege and show that the testing that he requested had a reasonable probability of producing more probative results. The trial court properly denied his motion. He made no such showing. In the appellate court, the court did not have any additional information in the record, but somehow found that it was sufficient to hold that he was entitled to the testing. It's, we would argue, probably best handled in the trial court to deal with these questions in the first instance. And to get there, the defendant needs to allege that he can make this showing. He hasn't done so in this case. Does that answer your question? Yes. As in, none of this was in the trial court. And, I mean, your briefs are really like scientific treatises, and I keep thinking, we're lawyers and judges. Help us talk like lawyers and judges rather than scientists, because I'm not so good at it. Exactly, Your Honor. And I would analogize this to a Frye situation, where this court will go outside of the record and review scientific literature to see if something is generally accepted in the scientific community, for example. And that would be similar to this court here. I mean, the appellate court in Barker relied on Butler. He's a fairly well-established, he's an established expert with this treatise. And the treatise, I mean, there actually is no dispute on the key issue here. The treatise points out a YSTR test, as he's requesting, is never more discriminating than the types of tests that were conducted before trial. He concedes in his appellate brief that a match pursuant to a YSTR test is never going to be as compelling as a match under the type of tests that were conducted here. And just to be clear, the reason for this is that the YSTR test looks only at the Y chromosome, which is passed intact from father to son and throughout all the male relatives. There's an identical profile for a YSTR. So it gives a, it can show that someone is included versus excluded, but in terms of showing what's the likelihood that it was this person, it has a low probative value in saying we know for sure, based on this profile test, that it was this individual. It almost diminishes that, doesn't it? I mean, it includes all the respondent's relatives as possible individuals, so that would widen the group of people who are part of it. That's correct. And they would need, obviously, we know already about all the other DNA loci matches in this case. I mean, one would hope that they would be discriminated on the basis of those tests, but just based on the YSTR, we would have a relatively large class of individuals who could have left the crime scene sample. And I did want to get back to your question about what is the harm. I think it's fair to say in a single case, maybe there's not a significant harm. The problem here is that the court needs, in this case, to articulate a standard that will apply to everybody. And if the court were to adopt a standard that enabled this defendant to get further testing, then it's difficult to imagine a case where a defendant couldn't meet the standard. So we would have defendants throughout the state of Illinois, any time a new test is developed, all moving for further post-conviction testing. And I'm sure the court is aware that there have been significant problems in terms of the state forensic labs and their workload. There's a current problem of a backlog. And that would just further, I think, the delays and cause harm. And it's harm not just to the people who are awaiting trial who would have to wait longer. It also harms the people who were supposed to be protected by the statute. People who are actually innocent, who may have meritorious claims, who do meet the standards of the statute and are seeking a more probative test. Those individuals would also have to wait longer if we had an increased backlog of tests where we can all say we know what the result is going to be. So, as discussed, this court dealt with C-1 in Savory. This court has not yet addressed A-2. It's a relatively new addition to the statute. It was enacted pursuant to an amendment in 2007. There are two principles here that should lead the court to hold that this is not a new statute. One is that this sets forth an independent and distinct requirement, the first being that the court tries to render no part of a statute superfluous. The second, that this court is inclined to view an amendment to a statute as a change in the law. Now, I am unable to determine from defendants' brief what standard he would articulate that gives independent meaning to A-2. He essentially asks this court to render it superfluous and to render the amendment ineffective. Now, the court is considering an issue of first impression here, and it does, as Justice Keist noted, involve some fairly complex scientific issues, but the gist of the statute seems to be fairly clear. And that is that where there has been previous testing, and the statute is fairly liberal now with respect to defendants who had no testing, who were convicted before there was DNA testing available, the statute makes it more difficult for a defendant like this one, who's already seen the benefit of testing. This defendant, as discussed, has already had three tests conducted. The statute says, if you've already had the benefit of those tests conducted before trial, you must show that the new test that you're requesting is going to give us better information, more probative information of who the perpetrator of the crime was, than the previous testing has done. And the defendant, as discussed, the YSTR test, is just as a general principle never going to be more probative than the tests that were conducted here before trial. But if that YSTR testing excluded the defendant, wouldn't it be probative? It would be probative of his innocence. But here's the problem. If it only needs to be probative of innocence, any DNA test is going to qualify. Any test that looks at an additional locus on the DNA molecule is going to have some theoretical potential to exclude someone who hasn't yet been tested on that locus. But in order to give some meaning to the statute, what does it mean more probative results? I think it has to be probative of the ultimate issue of the identity of the perpetrator. Is this going to give us a more certain result that we can say, this profile establishes that this defendant and only this defendant left the sample? So I think in order to affect this language, the court has to consider probative value as to that issue, because otherwise it would really have no role, because it would be meaningless in the DNA context. But we can also say confidently that it won't produce a result that excludes the defendant. We know this based on, in particular, on the statistical analysis that was conducted by Rhonda Carter. We know that he's one of 1.1 trillion of the people who have this particular DNA profile. We can extrapolate from what we know about that to guess at whether he will match at other loci. And we can guess, based on what we know now, that the YSTR profile is going to match as well as all of the other loci that were studied. The nine that were studied by Rhonda Carter, the seven that were studied by Aaron Small, all of those tend to predict what the outcome of the YSTR test would be. Aside from the DNA evidence, you take the position that the evidence was truly overwhelming? Yes, Your Honor. Other than the attempted fight and the burning of the vehicle, what other evidence was there? The most important piece of evidence, and I think the appellate court overlooked this, is the victim's physical description of the defendant and his vehicle. It's a rare case where a murder victim survives long enough to give us a description of who did it. Based on that, there is a very small universe of people who could possibly be the perpetrator of the crime. What was the description she gave? She described him as a Caucasian male, between 20 and 30 years old, who is fairly stacky, who is blonde. And all of this matches the defendant's physical characteristics at the time. Was that specific enough to make it so clear that he was the perpetrator? That combined with, and it's not just the flight and the burning of the car, that combined with the fact that he took the victim to his own previous property where he used to live, where he knew it was isolated, he knew no one was around. She testified that she was attacked on the property where his family lived. She didn't know the area. The way that they found the property is she was able to walk to a neighbor's. So they knew that there was a limited area where it could have been. When they investigated the property that the defendant used to live at, they found immediately a matted-down area in the grass and fresh bloodstains. So it was readily inferred that this was the scene of the attack. And that was later further confirmed based on DNA that the victim, this was her blood, and then she also left blood at a nearby house that she ran to for help, and then they were able to retrace her steps in that manner. But that's a highly significant piece of evidence, because what is the universe of people that's going to know about this isolated location and going to know that nobody is living there at the time? The defendant knew that because he had recently vacated the property. And just to stress, I mean, this was, it's not a simple thing to go from where they were in Peoria to this location. It was, it took an hour of driving to get there. This was something that only the defendant would be likely to take someone from Peoria all the way to this location. So that, in addition to the description, which was fairly detailed, it was, you know, the best that could be done when she was unable really to answer a lot of questions, that all provides the overwhelming evidence. And then, I mean, really the flight and the burning of the car is really just the... How much time between the incident and the discovery of the burning car? The car was seen before they knew the description of the car. There was an officer who was placing posters in front of the defendant's house. It was a part-time job. And he saw them burning the car. They didn't know the significance yet. But he happened to observe this happening. And then later the, it came together that this was the car in which the attack occurred. And then that was, became explainable. And I see my time is up. So I will reserve my remaining comments for rebuttal. Thank you. Good morning, Your Honors. Andy Boyd from the State Appellate Defender's Office on behalf of Defendant Ronald Stecker. The first thing I'd like to talk about is counsel's assertion that under this statute, the defendant somehow has to provide more probative evidence, more probative being indicative of who committed this crime. I would respectfully suggest that that is not what the statute says. That could not have been what the legislature intended. This fear is dangerously close to burden shifting. It is not the defendant's responsibility under this statute to point directly to who might have committed this crime. What the statute is designed to do is to help defendants exonerate themselves with post-conviction DNA evidence. Now, one of the arguments I'd like to talk about, and I'd like to start with this, is what I call the floodgates argument. Counsel's argument that if this court were to allow defendant to obtain post-conviction DNA testing, that would somehow open the floodgates for numerous defendants to go ahead and request and receive post-conviction DNA testing. That would not be the case for a number of different reasons. The first reason, the vast majority of defendants in this State and in all States are convicted under guilty pleas. If my recollection is correct, it's well over 90 percent, perhaps even up to 95 percent. This Honorable Court has already decided in the O'Connell case in 2007 that guilty plea defendants are not entitled to post-conviction DNA testing under the statute. So this O'Connell case knocks out almost all of the defendants who've been convicted in this State. Of those defendants who went to trial, there's a number of statutory hurdles that they'd have to clear in order to obtain post-conviction DNA testing. They first have to show their prima facie case, meaning identity would have to be the issue, and the evidence would have to be shown to be subject to a secure chain of custody. The next thing they'd have to show under Section C-2 is that this could provide some sort of new and non-cumulative evidence that would help the defendant substantiate his claim of innocence. But, counsel, going back to A-2, what's the reason for it? Because I see where the State would say that the majority ignored it. Right. I think your response was they didn't really ignore it because they found that C-1 was satisfied, necessarily A-2 was satisfied. Right. I'm trying to understand that. Wouldn't that make A-2 superfluous, then? It's not clear, as the statute has written, precisely what A-2 is intended to do. As I'm sure this Court is aware, there's not a lot of case law that directly addresses this A-2. It's a fairly recent addition to this statute. It's a little difficult to tell, frankly, from the statutory test, exactly what A-2 indicates. Counsel, doesn't it indicate something that the legislature meant it to at least be probative? I mean, if you're saying that only C-1 is relevant, why would they put in, you know, a section C-2, as Justice Thomas said, if it wasn't to be also addressed? The way that we read A-2 is that it articulates a pleading standard. A defendant seeking post-conviction DNA testing would have to plead certain things. And one of those things that the defendant would have to plead is that the testing that he or she wants is going to give more probative results. The test, the actual test that the trial court is supposed to utilize when it addresses one of these motions comes under C-2. And that's our argument, is that the way that this statute ought to be interpreted, is that A-2 presents a pleading standard, and C-1 and C-2 provide the test that the court should utilize when they're examining a motion under the statute. Well, did the defendant plead that a Y-star test had a reasonable likelihood of producing more probative results? I don't know that he pled that in so many words, Your Honor, but that certainly was the thrust of his pro se motion, and it was the thrust of appointed counsel's supplemental motion. Let's look at the motion to make it really clear here. If we're talking about what does A-2 mean, that seems to be the challenge before this Court in the question part. You say it's a pleading statute. What was pled? There are four paragraphs in the supplemental motion. Regarding the request for Y-chromosome analysis, Y-chromosome analysis allows  that I can't tell quite what this article is or what the website is. The Stryker trial transcript shows there was male-female. There is no indication that the Y-chromosome testing was conducted. Such mixed samples can lead to misidentification of the contributor's sample, citing to an ACLU website. It is submitted that it's a scientific determination that DNA evidence once purported to have originated from Mr. Stryker did not, in fact, have him as its source, would inarguably be materially relevant to his assertion of innocence. And that's the extent of what the motion was before the trial court. And the trial court's ruling was no one has given me an affidavit or any expert testimony, the Butler study. Nothing was given to the trial court in support of those allegations. Do these allegations meet the pleading standards of A-2? I think that they do, because this pleading standard simply says that the test should the test must have a possibility of producing more probative results. And those more probative results come when we take a look at the potential problems that we see in the DNA testing that occurred in this case. And I've identified three of those potential problems. Were any of those three identified in the trial court? I cannot. I think one. This one says a mixed DNA sample from a male and female can lead to misidentification, saying this ACLU article. So there was that one that was before the trial court, correct? Right. Were any of these other problems that you've identified with the original testing, was that ever before the trial court? I cannot specifically recall. I don't think so. But I can't specifically recall. My recollection is that these were not specifically brought before the trial court, Your Honor. I would like to talk about some of these problems. And we've already touched on one of them, the differential extraction problem. Another more serious problem, in our view, is this failure to get a full 13 loci profile. The Butler Treatise, which is accepted as really the top treatise on forensic DNA analysis, pretty clearly indicates that a 13 loci profile is the gold standard. And that was not done in this case. It's not clear why it wasn't done, but it wasn't done in this case. Only a 9 loci profile was identified. And all the literature that I have found, and these three cases that I submitted to this court in my motion to supplement authority, indicate that a 9 loci profile is a partial match. It is not a full match. In the Wright case, there was some testimony, some deposition testimony from Donald Parker, who is the administrator of the Illinois DNA Offender Database. And what he said about 9 loci profile matches was if it doesn't match across the 13 loci, then it's not a true match. 9 loci comparisons are not true matches, and it's misleading to call them matches. This is a substantial problem here in the State's DNA testing. Another problem that is another potentially serious problem is the problem of contamination. And one of the things that I would like to point out to this Honorable Court, and counsel previously has said, well, there's no indication in the record that there was contamination in this case. There's no evidence of that. Well, it is true that there's no specific evidence of contamination in this case. However, there is a pretty clear indication in the record, and this is in the common law, page 2203. This is in Exhibit C of the Defendant's Pro Se Postconviction Motion. This is a Chicago Tribune article that talks about problems with the Illinois State DNA Lab. And in that article, it talks about Aaron Small, who was the DNA, one of the DNA analysis in this case. Aaron Small conceded that he handled the semen sample without gloves. Is that in the record? Pardon me? Is that in the record? It is. It is in the record. It's at C2203, Your Honor. It's Exhibit 3 to the Defendant's motion. Excuse me. To the motion in the trial court? Yes. Yes. It's Exhibit 3 to the motion in the trial court, the Pro Se motion, Your Honor. Yes. And Aaron Small concedes that he handled the semen sample without wearing gloves and his sample was contaminated with his own DNA. So what we have is the DNA analysis here who performed the differential extraction. Rhonda Carter did not perform a separate DNA extraction. Aaron Small did that. And he conceded that in another case, he contaminated a sample. It is not that far-fetched, Your Honor, to suppose that this may have happened in this case, although, again, I must concede there isn't any direct evidence that this happened. But it certainly has to be considered a possibility. Is that our standard? There's a possibility? I mean, again, in the motion before the trial court, there's no suggestion about a possibility of contamination. There's no – the arguments that you're making here, that's not what you're saying, Your Honor.     There's no possibility. I mean, if you look at the evidence presented at the trial court, we're looking at the statute. What level of evidence do you have to come forward with to comply with the statute? Well, under C-1, which is what we argue – the center point of the statutory test – we have to show that the test has the scientific potential to produce new, non-cumulative evidence that's materially relevant to the defendant's assertion of actual innocence. And this honorable court has stated in the Savory case the standard, and it's a very similar standard, whether the requested testing has the scientific potential to produce evidence that would significantly advance the defendant's claim of actual innocence. And so what we've got here is a case where there is strong possibilities that there's serious problems with the State's DNA testing. And one of the things that I mentioned in my brief, and I think that we can talk about a little bit here, is the problem with Aaron Small's DNA analysis. He tested only five loci, and what he found was that there was a match between the defendant and the victim at these five loci. I have run a probability analysis in my brief. I'm sure Your Honors have read that, and I certainly don't claim to be a math major. I'm not. But it's pretty clear that the probabilities are exceedingly small, that two people would match at five loci, particularly when there's a potential of more than two of these alleles or possibilities being present at these loci. So what we've got is a DNA analysis, Mr. Small, who's already made a terrible mistake in another case. And in this case, has gotten an exceedingly strange result. And this was the individual who performed that differential extraction. And in differential extraction, those were the results that Rhonda Carter then took and performed her test on. So if there had been some sort of contamination, the test that Carter performed would have been performed on contaminated evidence. That is a potentially huge problem. Your Honors, I'd also like to talk a little bit about the other evidence in this  case. And counsel spoke to that a little bit. And we would concede that there is some circumstantial evidence in this case. The appellate court talked about that when the appellate court rendered their decision. And what the appellate court said was that if you take away, essentially, if you take away this DNA evidence and just look at this other evidence, all this other evidence becomes circumstantial. This evidence is not, to put this in a colloquial manner, a dead-bang winner for the State if we take away the DNA evidence. And the fact is, Your Honor, the State called not one, not two, but three forensic scientists to testify about the DNA evidence in this case. This could not possibly have been a, the DNA could not possibly have been a collateral matter. It had to have been an exceedingly important matter, or they would not have gone to the trouble to call these three forensic scientists. And they discussed this evidence pretty thoroughly in their closing argument in this case. So it's very clear that the DNA evidence was pretty central to this case. It's not at all the other. Was all that DNA evidence consistent? Was the DNA evidence consistent? Between the three experts? The first expert, it may not be entirely proper to call the first expert a DNA expert. What the first expert testified to was, was her extraction of the crime scene sample from the victim's pants. The next two individuals, Small and Carter, were the ones who performed DNA analysis. And Small did testify that there was a match between a crime scene sample and the defendant. But he only tested five woke guy, and he also explained that there was a match between the defendant and the victim. So it's not entirely clear how probative Mr. Small's testing was. Carter's test did show what the State would call a match, but again, it was only a nine loci match. And these nine loci matches probably should not even be called matches, Your Honor. All the literature, all the secondary sources and studies that are referred to in these cases that we cited in our motion to supplement are pretty clear that nine loci matches are not matches. Kagan was that before the trial court? Again, I think that's the point, that the State's brief disagrees with you on it and says that's not true, except the literature disagrees with what you just said. And my question again is, how do we decide that here? I think in a case like this where we have such complicated scientific evidence and these complicated mathematical principles that go into these calculations, I think it's appropriate for this Court to go outside of what was merely presented to the trial court. I think if this Court doesn't do that, this Court is limiting itself to what was perhaps not the most fully developed argument at the trial court. There was appointed counsel. Appointed counsel did file a supplemental motion, but it perhaps was not as developed as it could have been at that point. And the only thing I can say about that is that these are pretty complicated principles. This was a difficult case for me to research and a difficult brief for me to write. It took me a considerable amount of time, and I'm not sure how much time trial counsel would have had. I certainly don't want to make excuses for trial counsel. I don't know what the situation he was in. But we had a situation where we had some very, very complicated, intricate, scientific principles that were not as developed as they could have been at the trial court. And if this Court limits itself to only what was presented to the trial court, this Court is limiting its analysis in a way that I don't think is appropriate. I do think it's appropriate in a case like this where we have these complex principles to go outside the record and to look at these. And I do think that counsel agrees with me. Counsel cited to this Butler treatise, and it was appropriate for counsel to do so. That is certainly considered to be the lead treatise, at least for lay people, on these types of cases. How do you know that? How do we know that? That's a fair question. I have spoken in the course of preparing this brief and preparing for oral argument I've spoken to an expert on this, and the expert informed me that this was the primary treatise. The research I've done online also indicates that the Butler treatise is this. But, Mr. Boyd, doesn't that, what Justice Tice is discussing, bring into Section A-2 again in why the intent of the legislature must be that that adds something to our decision-making is that Section A-2 must be part of the look at, which means that you have to prove that the new testing provides a reasonable likelihood of more probative results and that it has a scientific potential to produce new non-cumulative evidence. And isn't that the burden of the defendant to show that? The first response to that argument would be that we believe that A-2 presents a pleading standard. If this Honorable Court were to find that A-2 presented a separate independent test, we would also argue that we satisfied that test. This YSTR testing is better in cases of sexual assault where there are mixed samples of male and female DNA because what YSTR testing can do is go straight to the male sample without having to go through this differential extraction process. And it's clear from the literature that there's potential problems with this differential extraction. Even the State concedes that the differential extraction doesn't always completely separate the male and female fractions in a crime scene sample. All the literature indicates that. And so what we've got is a YSTR testing that can go straight to the heart of the matter in this case, which would be the defendant's DNA. So even if this Honorable Court were to decide that A-2 gave us a separate and independent test, it would still be the case that YSTR testing would meet that test because it's more probative in cases where there's mixed male and female samples. I'd like to conclude, Your Honor. Well, Mr. Boyd, let me ask you this. Yes, certainly. We've still got a few minutes. Certainly. You've said several times it's a pleading standard. Yes. As if that's somehow to be set aside. But doesn't the pleading standard say this is what you have to now prove up when you go to hearing? You have to prove up your pleading? I think we can then look at C-2. That's where it says this is what the Court must find. So, yes, you would have to prove up your pleadings, but you do that by means of satisfying the test in C-2. That's the way we interpret this. Without any reference, without any context as to what's in A-2? I mean, that's where I'm having difficulty making a connection in your argument. And I haven't decided, by the way. I understand. I think that in the course of analyzing C-2, certainly we could talk about probability. It would not be improper to talk about that, but we still maintain that A-2 is this part of the pleading standard. In conclusion, and very quickly, Your Honors, we want to be clear about what we're asking for. We're asking for a DNA test. We're not asking that this Court exonerate the defendant. We're not asking that this Court give this defendant a new trial. All we're asking for is a DNA test on the facts of this case. Your Honors, the criminal justice system is a search for truth. Why STR testing is going to do one of two things here. Either it's going to show that there's a non-match between a crime scene sample and defendant. That bolsters the defendant's claim of actual innocence. It might show that there's a match between the crime scene sample and defendant's DNA. In that case, we'll find out that the defendant's conviction is proper. From the perspective of the criminal justice system as a whole, from the perspective of the search for truth, either one of those results is a good result. There's no downside to giving this guy DNA testing. The floodgates are not going to be open, and we are going to find out either there's a match or a non-match, and the search for truth is going to be furthered if this  And then we'll have to decide whether or not we want to record Grant's defense request for a DNA test. Have there been any requests for friar hearings? Has there been a request for a friar hearing? No, there has not. Anywhere? No, there has not, Your Honor. If there's no other questions, we ask that this Court affirm the decision and that it's recorded. Thank you. Defendant stresses that this is a pleading standard. I don't think that gets him very far. He failed in this case to even plead that this is a more probative test than the tests that were conducted before trial. He said it's well-suited to male-female DNA mixtures. That's true. But the question is, is it better suited to those mixtures than the differential extraction that was performed and then the detailed testing of the non-Y part of his DNA profile? He does refer to a document that he attached to his motion. He's referring to a newspaper article. Aaron Small did commit an error. He did contaminate a sample in a completely unrelated case. Now, there's no evidence here that there was such contamination, so he failed to even argue that this was relevant in some way to the issue before the Court. It's just the fact that Aaron Small made an error in another case. It doesn't meet his burden of showing that he's entitled to testing. The issue of contamination was explored at trial. Counsel on cross-examination at R1410-11 cross-examined Small on contamination. He testified on redirect that he followed clean procedures in his testing protocol that said R1419. But the most important thing to consider about the contamination is it is not going to be fixed by a YSTR test. He's saying that the differential extraction failed and, therefore, we can't trust the results that we got from the other individuals who ran tests. But he's going to be testing the same sample. If, by his reasoning, this is a contaminated sample, it's going to be his. And, therefore, there's no potential that this will exonerate him. Finally, I would just stress it is true that there are complicated questions about the science. But the issues that are before the Court are limited and straightforward. And there's really no dispute on the key scientific fact that the YSTR test can never be more probative than the PCR testing done before trial. If the Court has no further questions. Just the 9 versus 13 markers. Yes, Your Honor. One, defendant seems to be contesting what constitutes a match. When can we say that two DNA profiles match? There is a distinction. He's correct as to whether it's proper to say that you have a definitive match if you have the 9 loci. What's important here, though, is that the 9 loci were sufficient for the statistical analysis that shows that this was a conclusive match between the defendant and the sample. In the majority of cases, it would be great to have the 13 loci. But that doesn't mean that we have to throw out any DNA evidence that doesn't meet the gold standard. And furthermore, the defendant's not asking to do this test. He's not asking to do the 13 loci. He's asking to do something that has even less potential to exonerate him. He's asking to do this very nonspecific, nondiscriminating YSTR test. Because of that, we would ask that this Court reverse the appellate court and reinstate the trial court's judgment denying post-conviction testing. Thank you, Ms. O'Connor. Mr. Boyd, case number 115756, People of the State of Illinois v. Ronald Stoker, will be taken under Advises, Agenda Number 2. Are these your excuse? It's fine. Thank you.